UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL R. KINNEY,

                Plaintiff,

-against-

ARTIST & BRAND AGENCY LLC; PINYAN
BRAND MANAGEMENT, LLC; LORI SALE;
JEAN KWOLEK; and JASON PINYAN,

                Defendants.

13cv8864 (LAK) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:**

In this action, brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201

*et seq.*, and the New York Labor Law ("NYLL"), §§ 650 *et seq.*, plaintiff Daniel R. Kinney

("Plaintiff") claims that defendants Artist & Brand Agency LLC ("ABA"), Pinyan Brand

Management, LLC ("PBM"), Lori Sale ("Sale"), Jean Kwolek ("Kwolek"), and Jason Pinyan

("Pinyan") (collectively, "Defendants") failed to pay him required minimum wages, overtime

premiums, and a portion of an earned commission.  By separate motions, Plaintiff and

Defendants have now both sought partial summary judgment.  Plaintiff, on his motion, seeks a

ruling that he has established liability on each of his claims, such that all that should remain is an

assessment of his damages.  (*See* Dkt. 47.)  For their part, Defendants seek dismissal of four of

Plaintiff's five claims against them.  (*See* Dkt. 50.)  For the reasons set forth below, I respectfully

recommend that both summary judgment motions be denied, based on the existence of triable

issues of fact.

## BACKGROUND

### A.      Factual Background[1]

This action arises from Plaintiff's work with two separate talent agencies, PBM and then

ABA.  ([Plaintiff's] Rule 56.1 Statement of Material Facts, dated Mar. 20, 2015 ("Pl. 56.1

Stmt.") (Dkt. 54), ¶ 4.[2])  Plaintiff has named these two agencies, together with their principals, as

Defendants in this action.  During the time that Plaintiff provided services to PBM, defendant

Pinyan was its sole owner and President.  (Id.)  Upon PBM's closure, Pinyan joined defendants

Sale and Kwolek as the founding partners of ABA (id. ¶ 42), and Pinyan then invited Plaintiff to

continue working with him at the newly-formed ABA (Declaration of Justin M. Reilly, dated

Mar. 20, 2015 ("Reilly Decl.") (Dkt. 51), Ex. C (Deposition of Daniel Kinney, conducted

Oct. 27, 2014 "Pl. Dep.") (Dkt. 51-3)),[3] at 32).  Plaintiff provided similar services to each of

these entities, under identical compensation arrangements.  (Id. at 32-33; Pl. 56.1 Stmt. ¶¶ 14-15,

73, 113.)

The parties' respective motions for partial summary judgment each turn on the question

of whether, during the periods of his association with PBM and ABA, Plaintiff was properly

characterized as Defendants' "employee."  In his motion, Plaintiff argues that he was an

---

[1] The facts summarized herein are taken from the parties' statements pursuant to Local Civil Rule 56.1 (Dkts. 54, 69), and from evidence they submitted in support of their respective motions (see Dkts. 51, 52, and 70, and exhibits attached to each).  Unless otherwise noted, citations herein to either Plaintiff's or Defendants' Rule 56.1 Statement, without a cross-reference to the other's responsive statement, indicate that the cited factual assertion is not in dispute.

[2] The docket reflects that Plaintiff was directed to refile this document because of a filing error.  (Dkt. 54.)  While it does not appear that Plaintiff ever did so, the document remains accessible on the docket.

[3] See also Declaration of Michael K. Chong, Esq., in Support of Defendants' Motion for Partial Summary Judgment, filed Mar. 20, 2015 ("First Chong Decl.") (Dkt. 52), Ex. D ("Pl. Dep.") (Dkt. 52-3).

employee of PBM and then of ABA, and that, as such, he was entitled to be paid in accordance with the minimum-wage and overtime protections of the FLSA and NYLL.  (*See generally* Memorandum of Law in Support of the Plaintiff's Motion Pursuant to Fed. R. Civ. P. 56 for Partial Summary Judgment, dated Mar. 20, 2015 ("Pl. Mem.") (Dkt. 48).)  Plaintiff further argues that, even though he eventually left ABA, his status as a former employee should entitle him, under his reading of NYLL, Article 6, § 191(1)(c), to receive the last installment of a commission that he allegedly earned in the course of his employment.  (*Id.*)  By contrast, in their motion, Defendants contend that Plaintiff was an "independent contractor" and thus not entitled to a minimum wage or overtime pay.  (*See generally* Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment Pursuant to Federal Rule Civil Procedure 56, filed Mar. 20, 2015 (Dkt. 59) ("Def. Mem.").)  Defendants further contend that, even if Plaintiff was an employee, he was, in any event, exempt from the FLSA and NYLL as an "outside salesperson."  (*See id.*)  Defendants do not move for judgment on Plaintiff's claim for his allegedly earned commission.  (*See id.*)

### 1.  Plaintiff's Employment Prior to PBM

Before working with PBM, Plaintiff was employed by a talent agency called International Creative Management ("ICM").[4]  (Defendants' Statement of Material Undisputed Facts in Support of Defendants' Motion for Partial Summary Judgment, dated Mar. 20, 2015 ("Def. 56.1 Stmt.") (Dkt. 69), ¶¶ 30-31; Pl. Dep., at 11.[5])  Plaintiff testified that, during his time at ICM, he

---

[4] Plaintiff testified that he began working at ICM in the summer of 2008.  (Pl. Dep., at 11.)

[5] The Court notes that, in their Rule 56.1 Statement, Defendants numbered two fact statements "63"; for the purposes of this Report and Recommendation, this Court has adopted the corrected number system that is utilized in Plaintiff's counterstatement (Dkt. 75).

held several positions, with differing levels of responsibility and different compensation arrangements.  (*See* Pl. Dep., at 12-24.)  Notably, Plaintiff testified that he had a written employment contract with ICM and that he was not paid on a commission basis for any of the positions he held there.  (*Id*. at 70-73.)[6]

Through his work as an assistant in ICM's endorsement department in New York, Plaintiff met Pinyan, who, at the time, also worked for ICM, as an agent located in California.  (Def. 56.1 Stmt. ¶ 30.)[7]  At some point, Pinyan left ICM and founded his own company, PBM, a California-based agency that represented celebrity talent for commercial endorsements and branding.  (Pl. 56.1 Stmt. ¶¶ 2, 8; Def. 56.1 Stmt. ¶ 41; Reilly Decl., Ex. D (Deposition of Jason Pinyan, conducted Oct. 30, 2014 ("Pinyan Dep.") (Dkt. 51-4)),[8] at 26-28.)

---

[6] Although Plaintiff testified that his contract with ICM was a "standard employment agreement" that set out his hours, compensation, and benefits (*id*. at 71), the record does not contain a copy of that agreement, nor is it clear whether Plaintiff had a written contract covering the entire duration of his employment with ICM.

[7] While later working as a department coordinator at ICM, Plaintiff also met defendant Sale, who, at the time, was one of two individuals "in charge" of Plaintiff's department (Pl. Dep., at 18-19, 21).

[8] *See also* First Chong Decl., Ex. C ("Pinyan Dep.") (Dkt. 52-2).

2.      **Plaintiff's Work With PBM**[9]

a.      **Initial Understandings of Work Relationship**

Plaintiff was eventually laid off from his position at ICM,[10] after which, for a short

period (less than six months), he collected unemployment benefits.  (Def. 56.1 Stmt. ¶ 32; Pl.

Dep., at 61.)  Then, in the spring or summer of 2010, Plaintiff was contacted by a former

co-worker, Daniel Palay ("Palay") about a position with PBM.  (Declaration of Daniel Palay in

Support of Defendants' Motion for Summary Judgment, dated Feb. 3, 2015 ("Palay Decl.") (Dkt.

58), at 1-2; Pl. Dep., at 87-88.)  According to Palay, who had himself been working as a "talent

agent" with PBM (Palay Decl., ¶¶ 2, 4), his conversation with Plaintiff concerned the possibility

of Plaintiff's taking over his position (*id.*, ¶¶ 7-10).  In his deposition, Plaintiff described the

conversation somewhat differently, testifying that he "[did]n't know about replacing [Palay]"

and understood only that Palay would be "leaving," and Plaintiff would be "starting" at PBM.

(Pl. Dep., at 72.)

In any event, Plaintiff subsequently spoke directly with Pinyan (the owner and President

of PBM), in two telephone conversations.  (Pl. 56.1 Stmt. ¶ 4; Pinyan Dep., at 37-38.)  At his

deposition, Pinyan testified that, in the first of those conversations, he asked Plaintiff whether

Palay had told him "what the arrangement would be for the independent contractor" and that

---

[9] As Plaintiff's employment status is in dispute (*see, e.g.*, Pl. 56.1 Stmt. ¶ 1 (stating that Plaintiff "performed work" for PBM and Pinyan); Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment, dated Apr. 10, 2015 ("Def. Counterstatement") (Dkt. 73) ¶ 1 (stating that Plaintiff "performed services" for PBM and Pinyan "as an independent contractor")), the term "work," in a general sense, is used herein to refer broadly to the work performed and/or services provided by Plaintiff for Defendants.

[10] Plaintiff testified that he was laid off from ICM because "business was slow and the agency had lost a number of their high-profile clients."  (Pl. Dep., at 69-70.)

Plaintiff "said, Yes."  (Pinyan Dep., at 38.)  Pinyan further testified that he then said to Plaintiff, "So to reiterate so there's no confusion, it is a 50/50 commission split with no cap.  There is no salary," to which Plaintiff responded, "That's fine."  (*Id.*)  As for the second conversation, Pinyan testified that Plaintiff wanted to know "specifics" about PBM's client list, and that Plaintiff said that "he did not have a laptop or a printer, and that [Pinyan] would need to buy that for him."  (*Id.*)  Pinyan also testified that he agreed to purchase the requested equipment, but told Plaintiff that, at the end of their relationship, it would have to be returned to Pinyan, as "the property of PBM."  (*Id.*, at 39.)[11]

In about July of 2010, the parties reached an oral agreement for Plaintiff to perform services for PBM.  (*See* Def. 56.1 Stmt. ¶ 51; Pl. 56.1 Stmt. ¶ 11.)

### b.      Plaintiff's Work From His New York Home

Plaintiff served in the capacity of a PBM "Account Executive" from approximately July 2010 to December 31, 2010 (Pl. 56.1 Stmt. ¶ 1); according to Defendants, Plaintiff requested this title, which had been the one used by Palay (Def. Counterstatement ¶ 12).[12]  It is undisputed that, upon his departure from PBM, Palay sent emails notifying "buyers"[13] that Plaintiff would not only be assuming Palay's responsibilities (*See* Pl. 56.1 Stmt. ¶ 13; Def. 56.1

---

[11] Pinyan further testified that Plaintiff did, in fact, eventually return the laptop that was provided to him, although he did not return the printer, which "was not working" at the time that Pinyan requested its return.  (*Id.*, at 40.)

[12] In his declaration, Palay states that he "worked with [PBM] as a talent agent."  (Palay Decl., ¶ 2.)  Palay does not state whether he used the title "Account Executive" during his time with PBM.

[13] Both parties refer to potential and existing celebrity clients of PBM and ABA as "talent" and to the entities that pay for the endorsement and branding services of those clients as "buyers."  The Court will adopt that terminology for the purposes of this Report and Recommendation.

Stmt. ¶ 59), but also would be opening PBM's New York office (Def. 56.1 Stmt. ¶ 60; Reilly

Decl., Ex. G (email transmissions dated July 6, 2010 to July 19, 2010) (Dkt. 51-9)).  The parties

dispute, however, whether Pinyan and PBM made similar statements, and whether Palay's

statements regarding the opening of the "New York office" were authorized.  (*Compare* Pl. 56.1

Stmt. ¶ 36 (stating that "PBM and Pinyan represented to their clients . . . that [Plaintiff] would be

opening up PBM's New York office"), *with* Def. Counterstatement ¶ 36 (stating that "PBM did

not open a New York office," and that Palay was only "supposed to advise that [Plaintiff] was

taking over Palay's buyers, and that [Plaintiff] lived in New York").)

     With respect to the services that Plaintiff performed for PBM, the parties agree that

Plaintiff worked from his New York apartment, at least primarily.  (*See* Pl. 56.1 Stmt. ¶ 23; *see*

*also* Def. Counterstatement ¶ 125 (stating that, "[w]hen providing services to PBM, [Plaintiff]

worked out of his apartment, as well as Starbucks and hotel lobbies, where there was Wifi

available").)  Plaintiff goes further and contends that Defendants "established" a home office for

him, by equipping it with a telephone line, a laptop, an email address, a printer with scanner and

fax capabilities, USB sticks, and printer cartridges.  (Pl. 56.1 Stmt. ¶ 18.)  While Defendants

generally deny that Pinyan and PBM "established [Plaintiff's] home office in New York," and

specifically deny that they provided Plaintiff with a telephone line, they do admit that they

provided him with a laptop and printer.  (Def. Counterstatement ¶¶ 17-18.)  As for the PBM

email address that Plaintiff used in connection with his work, Defendants explain that Plaintiff

took over the email address that had previously been used by Palay.  (*Id*. ¶ 18.)

### c. <u>Nature of Services Performed by Plaintiff for PBM</u>

     Plaintiff's duties at PBM included "pitching clients for business opportunities, invoicing

deals that closed, following up for payments, researching prospective clients, taking talent

meetings, and maintaining a substantial talent grid of potential buyers and businesses for PBM,"

as well as communicating via telephone and email with Pinyan in California, and with talent and businesses across the country.  (Pl. 56.1 Stmt. ¶¶ 26-27.)  Both the email address and business cards used by Plaintiff identified him as a PBM Account Executive (*id.* ¶¶ 20-21, 35), and it is undisputed that Plaintiff was authorized to send emails to talent and buyers using the PBM email address that he was provided, and to place both his name and the name of the company in the signature of those emails (*id.* ¶¶ 20-21).

Plaintiff did not have to find his own clients, but instead was tasked with finding opportunities for PBM and Pinyan's clients.  (*Id.* ¶ 15.)  Indeed, it is undisputed that PBM and Pinyan provided Plaintiff with their confidential client list, and the parties agree that Plaintiff worked only for PBM and Pinyan during the duration of their business relationship.  (*Id.* ¶¶ 16, 37.)  The parties dispute, however, whether Plaintiff was expected or required to work exclusively for PBM and Pinyan.  In this regard, Plaintiff contends that the client list was provided with an expectation that he "would be working exclusively for PBM and Pinyan" (*id.* ¶ 16), while Defendants contend that they gave the client list to Plaintiff during the parties' discussions regarding Plaintiff's replacement of Palay, that Palay had no expectation of exclusivity as to non-PBM clients, and that, in fact, Palay "was not *required* to perform services exclusively for PBM and Pinyan" (Def. Counterstatement ¶¶ 16, 38 (emphasis in original)). According to Plaintiff, he was forbidden from seeking his own deals with outside clients (Pl. 56.1 Stmt. ¶ 38), but Defendants state that the only expectation of exclusivity was with respect to deals done with PBM clients (Def. Counterstatement ¶¶ 16, 38).

### d.      Plaintiff's Hours and Compensation

Plaintiff states that he worked for PBM from his home office for about 50 hours per week – from approximately 9:00 a.m. until approximately 7:00 p.m., Mondays through Fridays – and that his hours were set this way because he spoke to talent managers in various time zones.

(Pl. 56.1 Stmt. ¶¶ 23-25.)  In response, Defendants concede that, in connection with his work, Plaintiff did speak to people in different time zones, but Defendants state that Plaintiff spoke to "buyers," not "managers," and they further assert that they do not know how many hours per week Plaintiff worked because he was never required to report his hours to PBM or Pinyan. (Def. Counterstatement ¶¶ 23-25.)

As for his pay, it is undisputed that "Pinyan had [the] authority to . . . devise and implement PBM's method of compensating [Plaintiff]" (Pl. 56.1 Stmt. ¶ 6), and that Plaintiff was paid "on a commission[-]only basis with a 50/50 split structure" (*id.* ¶ 14).  During the time that he worked for PBM, Plaintiff earned a total commission of $2,350.00.  (*Id.* ¶ 40; *see also* Reilly Decl., Ex. H (1099 Form for 2010) (Dkt. 51-10).)

Plaintiff did not spend any of his own money in connection with his work for PBM, nor did he make any investment in or monetary contribution to PBM.  (Pl. 56.1 Stmt. ¶¶ 31, 34.) Thus, Plaintiff "never sustained a loss of any money as a result of performing work for PBM and Pinyan"; rather, his "only financial risk was that he might work and not make any money for his efforts."  (*Id.* ¶ 33.)  Plaintiff's meal, drink, and transportation expenses were paid by PBM and Pinyan (*id.* ¶ 28), although Defendants state that Pinyan only agreed to reimburse Plaintiff at Plaintiff's request, because Pinyan knew that Plaintiff was struggling financially (Def. Counterstatement ¶ 28).  The parties agree that, in order to be reimbursed, Plaintiff had to submit expense reports for Pinyan's review.  (Pl. 56.1 Stmt. ¶ 30.)

### 3.   Plaintiff's Work With ABA

On or about December 31, 2010, after Plaintiff had served as an Account Executive with PBM for approximately six months, Pinyan closed PBM.  (*See id.* ¶ 39; Pl. Dep., at 32.) Thereafter, Pinyan joined Kwolek and Sale as partners of ABA (Pl. 56.1 Stmt. ¶ 42), and invited

Plaintiff to continue providing services to that newly-formed entity (Pl. Dep., at 32).  Like PBM, ABA was a California-based talent agency "in the business of trying to place talent in contracts with brands."  (Pl. 56.1 Stmt. ¶¶ 44-45.)

As the partners of ABA, Sale, Kwolek, and Pinyan (collectively, with ABA, the "ABA Defendants") each had "an equal ability to speak and act on behalf of ABA and to bind ABA." (*Id*. ¶ 50.)  They were responsible for determining employee salaries, making hiring decisions, and devising, implementing, and supervising policies relating to employees and independent contractors.  (*Id*. ¶¶ 56, 61, 68.)  With respect to their specific duties, Sale served as "point person for specific clients," "handl[ed] relationships that ABA secured with clients such as Momentum,"[14] and signed ABA's tax returns as a signatory of ABA's bank accounts (*id*. ¶¶ 53-54); Kwolek "sign[ed] contracts on behalf of ABA and [gave] directions and instructions to ABA employees" (*id*. ¶ 60); and Pinyan had the authority to set the working conditions and to fire ABA employees (*id*. ¶¶ 67-68).

### a.      Locations From Which Plaintiff Performed Services

From about January 1, 2011, to about November 20, 2012, Plaintiff provided services to ABA (*id*. ¶ 43), and, in that time, the ABA Defendants informed customers and interested parties that Plaintiff was working with ABA and was based out of New York (*id*. ¶ 104).  Plaintiff contends that the ABA Defendants also described him to clients as "ABA's New York presence" (*id*. ¶ 103), although the ABA Defendants dispute this, acknowledging only a single email in which Sale referred to Plaintiff as being in ABA's "New York office" (Def. Counterstatement ¶ 103).

---

[14] *See* discussion *infra* and at n.14, regarding Momentum.

Plaintiff asserts that, when he first began working with ABA, he worked from the home office that, he contends, had been "provided to him" by Pinyan and PBM, a characterization Defendants dispute.  (Pl. 56.1 Stmt. ¶ 125; Def. Counterstatement ¶ 125.)  In March 2011, though, ABA executed a one-year agreement to serve as a consultant to Momentum Worldwide ("Momentum"),[15] and that agreement provided for Plaintiff's use of a workspace at Momentum's New York offices.  (Pl. 56.1 Stmt. ¶¶ 137-38.)  Plaintiff states that the ABA Defendants required him to work from the Momentum office (*id.* ¶ 139), but the ABA Defendants dispute this (Def. Counterstatement ¶ 139).  Rather, the ABA Defendants maintain that, through the agreement with Momentum, they provided Plaintiff with an office to use at his option because he had expressed a desire for a dedicated workspace, but that he was in no way required to, and occasionally did not, work from there.  (*Id.* ¶¶ 137-39; Def. 56.1 Stmt. ¶¶ 85-86.)

The Momentum workspace consisted of a long table that Plaintiff shared with Momentum employees.  (Def. 56.1 Stmt. ¶ 87.)  Plaintiff states that the office was equipped with a computer, laptop, phone line, and other office equipment, although Defendants contend that the office did not have a phone line dedicated to ABA business.  (Pl. 56.1 Stmt. ¶ 138; Def. Counterstatement ¶ 138.)[16]

---

[15] The consulting agreement states that it was entered into by and between "Mworks Worldwide, Inc." – Momentum's affiliate – and ABA and its principals.  (*See* Reilly Decl., Ex. Y (Consulting Agreement) (Dkt. 51-27).)  Pinyan testified that the agreement effectively provided that the ABA Defendants would serve "as independent contractors to make connections between Momentum and Hollywood in order for Momentum to get into scripted and non-scripted properties (television) and to secure branding space to fund said properties."  (Pl. 56.1 Stmt. ¶ 134 (citing Pinyan Dep., at 92).)

[16] Plaintiff also cites a provision of the Momentum contract that, according to Plaintiff, refers to him as being an ABA employee.  (Pl. 56.1 Stmt. ¶ 133.)  The cited provision, however, which prohibits ABA from soliciting Momentum's employees for a period after the contract term, merely appears to acknowledge that ABA's obligations in this regard would not apply to any solicitation of Plaintiff, whom the agreement – apparently in error – appears to describe as an employee of *Momentum*.  (*See* Def Counterstatement ¶ 133; Reilly Decl., Ex. Y (Momentum

### b.  __Nature of Services Performed by Plaintiff for ABA__

Although Plaintiff suggested the title of "Talent Manager" for his position with ABA, the ABA Defendants again assigned him the title of "Account Executive."  (Pl. 56.1 Stmt. ¶ 71.) Defendants contend that this decision was predicated on the specific implications of the word "manager" in the entertainment industry.  (Def. Counterstatement ¶ 71.)  In communications to other parties, the ABA Defendants presented Plaintiff as a "member of the ABA team" (Pl. 56.1 Stmt. at ¶ 102), and they featured his name, job title, photograph, and biography on ABA's website (*id*. ¶ 104).

Plaintiff performed similar duties for ABA as he had performed for PBM.  (*See* Def. 56.1 Stmt. ¶ 14.)  The ABA Defendants provided Plaintiff with an ABA email address and authorized him to place the company name in his email signature.  (Pl. 56.1 Stmt. ¶¶ 97-100.)  Plaintiff also was given business cards, which featured his name and title along with the ABA company logo. (*Id*. ¶ 101.)  Plaintiff communicated with the ABA Defendants several times each day, providing them with "daily updates on ABA business, including the status of certain pitches and negotiations, invoicing, and escorting clients to various functions," and also participated with them in weekly telephone conferences.  (*Id*. ¶¶ 94-96.)

Plaintiff additionally attended business meetings in New York on behalf of the ABA Defendants.  (*Id*. ¶ 92.)  Defendants state that Plaintiff was merely invited to attend these meetings, and that he, at times, declined such invitations.  (Def. 56.1 Stmt. ¶ 126; Def. Counterstatement ¶ 121.).  For his part, Plaintiff contends that he was required "to meet with [clients] at a certain location with a certain brand," and that the partners expected him to

---

Agreement) (Dkt. 51-27), at 115.)  Neither party is suggesting that Plaintiff, at any time, was employed by Momentum.

accompany clients to projects like photo shoots and PR meetings.  ([Plaintiff's] Response to

Defendants' Statement of Undisputed Facts, dated Apr. 10, 2015 ("Pl. Counterstatement")

(Dkt. 75) ¶ 126; Pl. 56.1 Stmt. ¶¶ 121-22; Pl. Dep., at 94.)  The parties do not dispute that

Plaintiff maintained an iPhone calendar and that he provided the partners with his schedule prior

to meetings with ABA clients.  (Pl. 56.1 Stmt. ¶ 114.)

     The ABA Defendants do not dispute that they gave Plaintiff access to their talent list and

grid (*id.* ¶ 108),[17] which were only provided to "those people directly involved as account

representatives or account managers" (*id.* ¶¶ 110, 112).  They dispute, however, Plaintiff's

assertion that they *authorized* him to use their talent roster to "source deals" *on their behalf*, and

rather contend that they *allowed* Plaintiff to use the roster to source deals *for* them.  (*Id.* ¶ 109;

Def. Counterstatement ¶ 109.)  Additionally, while all parties agree that Plaintiff "performed

work exclusively for ABA Defendants and . . . could not pitch ABA talent to rival agencies or to

anyone else" (Pl. 56.1 Stmt. ¶ 115), the parties dispute (as they do with respect to Plaintiff's

work for PBM) whether their association was required to be exclusive.  Plaintiff states that the

ABA Defendants expected him to work only for ABA, and that he therefore could not seek to

negotiate deals with outside clients, while Defendants claim that Plaintiff's securing a deal with

non-ABA talent would not have violated his obligations to ABA.  (*Id.* ¶¶ 116, 118; Def.

Counterstatement ¶¶ 116, 118.)  The parties do not dispute, though, that, "if [Plaintiff] closed a

deal with talent other than ABA clients, [the] ABA Defendants obligated [Plaintiff] to report said

deal to ABA."  (Pl. 56.1 Stmt. ¶ 117.)

---

[17] ABA maintained a "talent list" – a roster of talent associated with ABA – as well as a
"talent grid" – a spreadsheet denoting the talent, brands, and other agencies covered by each
individual working with ABA.  (Pinyan Dep., at 126-27.)

Regardless of whether he was bound by any exclusivity requirement, Plaintiff had no clients outside of ABA during his time with them, and he did not take any clients from ABA upon his departure from the company.  (*Id*. ¶ 119.)  When Plaintiff closed a deal for or on behalf of ABA's clients, the talent sent payment to the ABA Defendants.  (*Id*. ¶¶ 48, 76.)  It is not disputed that Plaintiff would have violated his agreement with ABA, had he instructed talent or clients to send payments directly to him.  (*Id*. ¶ 79.)

### c.      Plaintiff's Hours and Compensation

Plaintiff maintains that he worked for ABA from approximately 9:00 or 9:30 a.m. to approximately 7:00 or 7:30 p.m., Monday through Friday, for a total of about 50 hours per week, and that he also worked on the weekends when necessary.  (*Id*. ¶¶ 89-90.)  As with Plaintiff's work with PBM, Defendants counter that, because Plaintiff was never required to keep track of or report the hours he worked, they have no knowledge of Plaintiff's hours or schedule.  (Def. Counterstatement ¶¶ 89-90.)  Defendants add that Plaintiff set his own work schedule, stating that he advised ABA when he would be on vacation, that he had declined to attend a photo shoot despite ABA's request, and that he was "frequently 'out of the office.'"  (Def. 56.1 Stmt. ¶¶ 97-99.)

Although Plaintiff did not have a written commission agreement, he was again paid on a commission-only basis for his work for ABA, receiving 50% of the price of offers that he procured.  (Pl. 56.1 Stmt. ¶¶ 73-74, 144-46.)  Plaintiff was instructed by the ABA Defendants to submit invoices in order to receive commission payments, and ABA determined when and how the invoices should be submitted.  (*Id*. ¶¶ 75, 77.)  In particular, Plaintiff was required to send invoices to Sale after being informed by Sale that ABA had received the funds from clients or talent; only after that would Plaintiff receive payment.  (*Id*. ¶ 78.)

14

In March 2011, at Plaintiff's request, the parties discussed switching Plaintiff's compensation structure to an arrangement that would guarantee Plaintiff a more steady income. (*Id.* ¶ 127; Def. 56.1 Stmt. ¶ 74 (stating that Plaintiff "said he needed a steady monthly income and asked to be on salary"); Def. Counterstatement ¶ 127.)  ABA offered Plaintiff a base salary of $40,000 per year with a draw against commissions,[18] which Pinyan acknowledged would have been the equivalent of "what a first year agent would have made in an agency."  (Def. 56.1 Stmt. ¶¶ 75-76; Pl. 56.1 Stmt. ¶ 128.)  Pinyan further stated that this offer "was more than fair[,] based on [Plaintiff's] skill set and skill level."  (Pl. 56.1 Stmt. ¶ 128.)  Plaintiff countered the offer with a suggested salary of $22,500 for a six-month period, but ultimately decided to continue with the 50% commission split, to be re-examined after six months.  (Def. 56.1 Stmt. at ¶ 71, 75.)  Plaintiff states that he decided to continue with the 50% commission split at the encouragement of the ABA partners. (*See* Pl. Counterstatement ¶ 71.)  Defendants assert that, if Plaintiff had accepted the ABA Defendants' offer to provide a base salary as a draw against commissions, then Plaintiff's responsibilities would have changed, in that he then would have been expected to provide services exclusively to ABA.  (Def. Counterstatement ¶ 118.)

To the extent that Plaintiff incurred business-related expenses in connection with his work for ABA, including drinks, meals, and transportation costs, he would itemize them in an expense report and submit them for reimbursement, which would be subject to the ABA Defendants' approval.  (Pl. 56.1 Stmt. ¶¶ 80-82.)  In addition, during the negotiation over the terms of Plaintiff's compensation, the ABA Defendants agreed to reimburse him for transportation expenses and to pay his health insurance.  (Def. 56.1 Stmt. at ¶ 71; Pl. 56.1 Stmt.

---

[18] This arrangement would have ensured that Plaintiff received a monthly income, but he would not have been entitled to any commission until the money he brought in to ABA equaled his base salary.  (Def. 56.1 Stmt. ¶¶ 74-76.)

at ¶ 131.)  The ABA Defendants then "paid for [Plaintiff's] health insurance on a monthly basis and deducted said payments as ABA business expenses."  (Pl. 56.1 Stmt. ¶ 83.)  As with his work for PBM, Plaintiff never incurred a loss of any money as a result of performing his work for ABA, and he never spent any money in connection with that work.  (*Id*. ¶¶ 86-87.) Moreover, Plaintiff was never required to make monetary contributions to ABA (*id.* ¶ 88), although Defendants maintain that he "invested" in ABA by sharing his prior industry contacts with the company (Def. Counterstatement ¶ 84).

### d.   The Brody-Gillette Commission

During his time with ABA, Plaintiff brought in a deal between the actor Adrien Brody and the company Gillette.  (*See* Pl. 56.1 Stmt. ¶ 147 (stating that Plaintiff "identified, tracked, and brought in a written offer"); Def. Counterstatement ¶ 147 (stating that, after Plaintiff brought in the deal, Sale and Pinyan negotiated and closed the deal).)  Plaintiff asserts that, through his work on the Brody-Gillette deal, he earned a commission that was to be paid to him in four installments.  (*See generally* Pl. 56.1 Stmt. ¶¶ 147-157.)

On June 6, 2012, Kwolek sent Plaintiff an email stating that Plaintiff was "entitled to 40k for Gillette," and informing him that his commissions would be released as the payments came in from the client.  (*Id.* ¶ 152.)  Kwolek stated that the fourth installment was not expected until July 15, 2013.  (Reilly Decl., Ex. BB.)  ABA paid Plaintiff the first three installments, and Plaintiff spoke to all three partners multiple times regarding the fourth installment.  (Pl. 56.1 Stmt. ¶ 154.)

In November 2012, though, after spending approximately two years with ABA, Plaintiff left ABA "on his own volition in order to find a position with steady income."  (*Id.* ¶ 164; *see* Pl. Dep., at 56; Pinyan Dep., at 121.)  Plaintiff thus ceased providing services to ABA before the

final payment on the Brody-Gillette deal was received, and all three ABA partners ultimately decided not to pay Plaintiff the fourth installment.  (Pl. 56.1 Stmt. ¶ 155.)  Defendants contend that, as per the industry standard,[19] Plaintiff was entitled to 50% of commissions only while he was "representing and in good standing with [ABA]," and that Plaintiff had been advised of this fact.  (Def. Counterstatement ¶¶ 149, 155.)  Regardless of whether this was the industry custom, however, Defendants paid Plaintiff for approximately five deals after he left ABA.  (Pl. 56.1 Stmt. ¶ 157.)  Defendants state that they paid Plaintiff those commissions because Plaintiff had negotiated and serviced those five deals, whereas he did not do so for the Brody-Gillette deal. (Def. Counterstatement ¶ 157.)

### 4.    Tax Treatment of Plaintiff's Income from PBM and ABA

As noted above, Plaintiff earned a total commission of $2,350 during the time he worked for PBM.  (Pl. 56.1 Stmt. ¶ 40; *see also* Reilly Decl., Ex. H (1099 Form for the year 2010) (Dkt. 51-10).)  This amount was reported as "non-employee compensation" on an Internal Revenue Service ("IRS") Form 1099-MISC ("1099 Form") that was prepared and provided to Plaintiff by Pinyan and PBM.  (Pl. 56.1 Stmt. ¶ 41.)  As part of his 2010 tax return, Plaintiff completed a Schedule C ("Profit or Loss from Business") to IRS Form 1040, indicating that he

---

[19] Defendants purport that "it is industry-standard that once an individual leaves an agency with them in any capacity . . . he or she is not entitled to commission."  (Pl. 56.1 Stmt. ¶ 157).

had $39,250 in business income,[20] and deducting $2,375 in office expenses[21] and $7,488 for the business use of his home.  (Reilly Decl., Ex. DD (Schedule C for years 2010-12) (Dkt. 51-32), at 107-08; *see also* Def. Counterstatement ¶ 18 (noting that Plaintiff deducted the expense of a home office.)  Plaintiff listed "Integrated Marketing" as his "Principal business or profession," and left the line reserved for "Business name" blank.  (Reilly Decl., Ex. DD, at 107.).

For the years from 2011 to 2013, Plaintiff was again provided with 1099 Forms by the ABA Defendants.  (Pl. 56.1 Stmt. ¶ 159.)  Plaintiff believed that he was given these forms because "that [was] how ABA Defendants were going to classify him to their accountants."  (*Id.* ¶ 160).  Defendants state, however, that Plaintiff had been informed, upon his inquiry, that he would not be receiving W-2 or W-9 forms because he was not an employee.  (Def. 56.1 Stmt. ¶ 137.)  Plaintiff states that he "had no other income in 2011 and 2012 besides the income earned at ABA while performing work for ABA."  (Pl. 56.1 Stmt. ¶ 158.)

In 2011, ABA paid Plaintiff $41,675, which ABA listed as "non-employee compensation" on the 1099 Form.  (Reilly Decl., Ex. CC (1099 Forms for years 2011-13) (Dkt. 51-31), at D015.)  On a Schedule C for that year, Plaintiff indicated business income of $41,983,[22] and deducted $4,270 in office expenses[23] and $7,488 for the business use of his home.

---

[20] During his deposition, when asked whether $2,350 was the amount he earned in 2010, Plaintiff replied, "From [PBM], yes."  (Pl. Dep. at 170.)  The record is not clear as to whether the $39,250 in business income that Plaintiff reported for 2010 also included income that Plaintiff earned from his previous job with ICM, or from any other sources.

[21] For 2010, Plaintiff reported office expenses in the amount of $603, deductible meals and entertainment in the amount of $1,354, and local transportation in the amount of $418.  (Reilly Decl., Ex. DD at 108.)d

[22] The parties' submissions offer no explanation for the $308 discrepancy between the compensation listed on Plaintiff's 1099 Form for 2011 and his Schedule C for that same year.

[23] The expenses for which Plaintiff claimed deductions in 2011 were:  depreciation and section 179 expense deduction, legal and professional services, taxes and licenses, deductible

(Reilly Decl., Ex. DD, at 105-06.)  In 2012, Plaintiff received compensation, again listed on a 1099 Form as "non-employee compensation," in the amount of $56,693.75.  (Reilly Decl., Ex. CC, at D016.)  On a Schedule C for that year, Plaintiff indicated business income of $56,694, and deducted $11,950 in office expenses[24] and $7,613 for the business use of his home.  (Reilly Decl., Ex. DD, at 103.)  In 2013, Plaintiff's 1099 Form listed, under non-employee compensation, the amount of $9,086.25.  (Reilly Decl., Ex. CC, at D017.)  The submitted record does not contain a Schedule C for the year 2013.

### B.   Procedural History

Plaintiff filed an initial Complaint in this action on December 16, 2013 (Dkt. 1), and, with leave of Court, filed an Amended Complaint on November 26, 2014 (Amended Complaint, dated Nov. 25, 2014 (Dkt. 30)).  In his amended pleading, Plaintiff claims that Defendants violated both the FLSA and the NYLL by failing to pay him required minimum wages, overtime pay, and the final installment of the commission he allegedly earned from the Brody-Gillette deal.  (*See generally id.*)  Defendants answered the Amended Complaint on December 22, 2014, asserting a number of affirmative defenses, including, *inter alia*, that Plaintiff worked for Defendants as an independent contractor, rather than an employee, and that Plaintiff's FLSA claims were barred by the statute's "outside sales" exemption.  (*See* Answer to Amended Complaint, dated Dec. 22, 2014 (Dkt. 31).)

---

meals and entertainment, local transportation, subscriptions and tech costs, digital subscriptions, and connectivity.  (*See id.*)

[24] The expenses for which Plaintiff claimed deductions in 2012 were:  depreciation and section 179 expense deduction; legal and professional services; office expense; taxes and licenses; travel, meals, and entertainment; travel; deductible meals and entertainment; subscriptions and tech costs; connectivity; and business gifts.  (*See id.*)

On March 20, 2015, Plaintiff filed his motion for partial summary judgment and
supporting papers.  (*See* Motion for Partial Summary Judgment, dated Mar. 20, 2015 (Dkt. 47);
Pl. Mem. (Dkt. 48); Pl. 56.1 Stmt. (Dkt. 54); Reilly Decl. (Dkt. 51).)  As noted above, Plaintiff
seeks partial summary judgment as to Defendants' liability, arguing that the discovery record
shows that Plaintiff worked for Defendants as their employee, and thus was improperly paid,
under both the FLSA and NYLL.  On April 10, 2015, Defendants submitted their opposition to
Plaintiff's motion (*see* Memorandum of Law in Opposition to Motion for Partial Summary
Judgment, dated Apr. 10, 2015 ("Def. Opp. Mem.") (Dkt. 72); Def. Counterstatement (Dkt. 73)),
and, on April 20, 2015, Plaintiff filed his reply (*see* Reply Memorandum of Law in Support of
Motion for Partial Summary Judgment, dated Apr. 20, 2015 (Dkt. 79)).

At the same time that Plaintiff filed his motion, Defendants also filed a motion for partial
summary judgment.  (*See* Motion for Partial Summary Judgment by Defendants (Dkt. 50); Def.
Mem. (Dkt. 59); Def. 56.1 Stmt. (Dkt. 69); Declaration of Michael K. Chong, Esq., in Support of
Defendants' Motion for Partial Summary Judgment, filed Mar. 24, 2015 ("Second Chong Decl.")
(Dkt. 70).)  In their motion, Defendants argue that Counts I-IV of the Amended Complaint (*i.e.*,
every count except the one seeking full payment of the Brody-Gillette commission) should be
dismissed on the ground that, based on the evidence adduced in discovery, Plaintiff was an
independent contractor, exempt from the minimum wage and overtime requirements of the
FLSA and NYLL.  Plaintiff opposed Defendants' motion on April 10, 2015 (*see* Plaintiff's
Memorandum of Law in Opposition to Motion for Partial Summary Judgment by Defendants,
dated April 10, 2015 ("Pl. Opp. Mem.") (Dkt. 74); Pl. Counterstatement (Dkt. 75)), and
Defendants submitted a memorandum in reply (*see* Reply Memorandum of Law on Behalf

Defendants in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment

(undated), filed Oct. 23, 2015 ("Def. Reply") (Dkt. 82)[25]).

The content of the parties' submissions is discussed in detail below.

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Summary Judgment

#### 1.   Rule 56 of the Federal Rules of Civil Procedure

A court must grant summary judgment where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-*

*Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996).  The moving party bears the burden of

showing that no genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

157 (1970).  Accordingly, the Court "must view the evidence in the light most favorable to the

party against whom summary judgment is sought and must draw all reasonable inferences in his

favor."  *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see Brown v. Henderson*,

257 F.3d 246, 251 (2d Cir. 2001).

The party opposing summary judgment may not rely upon the pleadings alone but must

instead cite to "particular parts of materials in the record" or show that "the materials cited [by

the movant] do not establish the absence . . . of a genuine dispute" as to any material fact.

---

[25] The lengthy delay in the filing of Defendants' reply memorandum is attributable to the fact that, while Defendants timely mailed a courtesy copy of this memorandum to the Court, they initially failed to file it electronically.  When this Court became aware of this, it reached out to counsel and requested that the document be filed.

Fed. R. Civ. P. 56(c)(1).  In so doing, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted), but must rather present "significant probative evidence tending to support the complaint," *Smith v. Menifee*, No. 00cv2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (citing *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 290 (1968)).  "If the evidence is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  Where there are cross-motions for summary judgment, the court must separately evaluate each motion on its own merits, drawing inferences against the movant.  *See Terwilliger v. Terwilliger*, 206 F.3d 240, 243-44 (2d Cir. 2000); *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015).

## 2. Local Civil Rule 56.1

Under this Court's rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law.  *Id.*  Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record.  *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

**B.**     **Legal Standards for Determining Employee Status**

      **1.**     **Fair Labor Standards Act**

To establish a claim under the FLSA, a plaintiff must demonstrate that he was an employee of the defendant within the meaning of the statute.  *See generally* 29 U.S.C. § 203; *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 31-32 (E.D.N.Y. 2015).  The FLSA defines "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1). In turn, it defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  Additionally, under the FLSA, "employ" means "to suffer or permit to work."  29 U.S.C. § 203(g).

To determine whether an individual is an employee or an independent contractor under the FLSA, the Second Circuit has adopted an "economic realities test," which requires consideration of five non-exclusive factors:  "(1) the degree of control exercised by the [purported] employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."  *Brock v. Superior Care*, 840 F.2d 1054, 1058 (2d Cir. 1988).  The first of these factors (degree of control) is "crucial" to the analysis, *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325 (S.D.N.Y. 2001) (citing *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)), but all of the factors should be evaluated in light of the totality of the circumstances, and no one factor is singularly dispositive, *Brock*, 840 F.2d at 1059.

"The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts – whether workers are employees or independent contractors – is a question of law."  *Id*.  "Accordingly, courts can and do grant summary judgment on this

threshold inquiry, but only where there are no disputed issues of material fact." *Landaeta v. N.Y. & Presbyterian Hosp., Inc.*, No. 12 Civ. 4462 (JMF), 2014 WL 836991, at *4 (S.D.N.Y. Mar. 4, 2014).  The primary question is "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059.

### 2.    New York Labor Law

The NYLL defines "employee" as "any person for hire by an employer in any employment," NYLL, Article 6, § 190(2), and defines "employer" as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service," *id.*, § 190(3).  Like the FLSA, coverage under the NYLL's minimum wage and overtime provisions extends only to employees.  *See generally id.*, Article 6, § 190; *id.*, Article 19, § 650.  In addition, the standards set forth in NYLL, Article 6, §§ 191(1)(c) and 198, which relate to pay requirements for "commission salesperson[s]"[26] and remedies for nonpayment of wages, are only applicable to those who are "employees" for NYLL purposes. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 170 (2d Cir. 1998) ("The statute defines a 'commission salesman' as an 'employee' whose earnings are based in whole or in part on commissions, and a person who is not an employee but an independent contractor is not within the scope of this section." (internal citation omitted)); *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 62 (S.D.N.Y. 2010) ("A commissioned salesperson is considered an employee under New York Labor Law . . . .").

---

[26] Under NYLL, Article 6, §§ 191(1)(c), an employer that employs a "commission salesperson" must keep on file a written agreement describing how the employee's commissions and any other earned wages are calculated.  *Id.*  The employer's failure to produce such a written agreement "give[s] rise to a presumption that the terms of employment that the commissioned salesperson has presented are the agreed terms of employment."  *Id.*

Under the NYLL, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003). As to this question, courts must evaluate five factors: "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id*. Additional factors may also be considered, *see Hart v. Rick's Cabaret Intern. Inc.*, 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013), including the label given to the employment relationship by the parties and the way in which the worker identified himself or herself for tax purposes, although the tax treatment of the worker's income is not dispositive, *see id*. at 924.

Moreover, "[t]here is general support for giving [the] FLSA and the [NYLL] consistent interpretations," *id.* (quoting *Topo v. Dhir,* No. 01 Civ. 10881 (PKC), 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004), and, accordingly, "there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Id*. *But cf. Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013) (noting that the New York Court of Appeals has not definitively answered the question of whether the NYLL test for employer status is identical to that applied under the FLSA).

**C.**     **Legal Standards for Determining "Outside Salesperson" Status**

Under the FLSA, "an employee employed . . . in the capacity of an outside salesman" is exempt from the statute's minimum-wage and maximum-hour requirements, 29 U.S.C. § 213(a)(1), and, in this regard, the NYLL incorporates the FLSA's exemptions, *see* NYLL Article 19, § 651(5) (exempting an "outside salesman" from the definition of "employee" for purposes of the NYLL's minimum wage requirement); *Gold v. N.Y. Life Ins. Co.,* 730 F.3d 137,

145 (2d Cir. 2013) (finding FLSA's outside salesman exemption incorporated into the NYLL's overtime requirement); *Cangelosi v. Gabriel Bros, Inc.*, No. 15-CV-3736 (JMF), 2015 WL 6107730, at *2 (S.D.N.Y. Oct. 15, 2015) (applying federal definition of "outside salesman" to overtime and minimum wage claims under the NYLL).  "An employee employed in the capacity of an outside salesman" is an employee whose "primary duty" is "making sales," or "obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer," and "[w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500(a).  "Primary duty" is defined as "the principal, main, major or most important duty that the employee performs."  *Id*. § 541.700(a).  In addition, courts consider the "hallmark activities" of outside salesmen, which include "(1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage."  *Chenensky v. N.Y. Life Ins. Co.*, No. 07 Civ. 11504 (WHP), 2009 WL 4975237, at *5 (S.D.N.Y. Dec. 22, 2009).  "The question of how an employee spends his time working is one of fact, but the question of whether those activities exempt him from the FLSA is one of law."  *Id*.

## II.    THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

As noted above, both of the motions before the Court turn primarily on the question of whether Plaintiff was an employee of Defendants, or an independent contractor.  Plaintiff claims that he was an employee within the meaning of the FLSA and NYLL, and that Defendants are liable on the grounds that they (1) violated the minimum wage and overtime premium provisions of the FLSA and NYLL, (2) failed to compensate Plaintiff for all hours worked in violation of the FLSA and NYLL, and (3) failed to pay Plaintiff the fourth installment of the commission on

the Brody-Gillette deal.  (*See* Pl. Mem., at 1.)  Plaintiff further argues that each of the named defendants, including the principals of the corporate defendants, should be considered "employers" within the meaning of the FLSA and NYLL, and thus be held jointly and severally liable for the violations of these statutes.  (*See id.*)  By contrast, Defendants argue that Plaintiff was exempt from the coverage of the FLSA and NYLL because he worked for PBM and ABA as an independent contractor (*see* Def. Mem. at 5-20); alternatively, Defendants argue that, even if Plaintiff worked for them as an employee, he was exempt from the wage and overtime requirements of the statutes as an outside salesman (*see id.* at 20-35).

A.   **Whether Plaintiff was an Employee
Within the Meaning of the FLSA**

As noted *supra*, a five-factor "economic realities" test must be applied in determining whether Plaintiff was an employee within the meaning of the FLSA, and no one factor can be considered dispositive.  *See Brock*, 840 F.2d at 1059.  Rather, the Court must consider the totality of the circumstances.  *Id.*  On the evidentiary record presented here, there are disputed issues of material fact that impact two of the factors that must be weighed under this test, including the "crucial" factor of the degree of control that Defendants exercised over Plaintiff's work, *see Gustafson*, 171 F. Supp. 2d at 325 (citing *Carter*, 735 F.2d at 12), and the factor that looks to Plaintiff's potential for profit or loss.  As, regardless of which side receives the benefit of favorable inferences, a reasonable fact finder could reach different conclusions regarding "the existence and degree" of these two factors, *Brock*, 840 F.2d at 1058, neither side is entitled to summary judgment on the ground that Plaintiff either was, or was not, Defendants' "employee."

1.   **Degree of Control**

With respect to the "degree of control" factor under the FLSA, Plaintiff highlights several aspects of the parties' relationship that suggest that Defendants treated him as an employee.

First, Plaintiff notes that Defendants assigned him the title of "Account Executive" (with ABA denying him the title of "Talent Manager" that he requested), provided him with company business cards, and gave him access to company email accounts.  (*See* Pl. Mem., at 11.)  In addition, Plaintiff points out that Defendants determined "the method of his pay, his commission rate, if any, and when and how he would get paid by them."  (*Id.*)  He also argues that ABA further evinced "control" by dictating how and when Plaintiff could submit invoices for payment.  (*Id.*)  Although Defendants challenge Plaintiff's assertion that they controlled his work, they do not dispute these underlying facts.

Plaintiff also raises some factual issues here that are disputed by the parties, though, asserting that Defendants required him to maintain certain work hours, to provide Defendants with his schedule, and to attend meetings and conferences that Defendants arranged.  (*Id*. at 11-12.)  In support of these contentions, Plaintiff has submitted his sworn deposition testimony that he was, at times, "told [by ABA Defendants] to meet with [a client] at a certain location with a certain brand" (Pl. Dep., at 94), and he points to email correspondence among Sale, Caitlin Byrne ("Byrne"),[27] and a client, showing that defendant Sale had scheduled a meeting for Plaintiff to attend and requested that he "hold some time" on that date only after the meeting had already been set (*see* Riley Decl., Ex. V (Emails Regarding Trachtenberg/Eastman Meeting) (Dkt. 51-24)).  Plaintiff also contends that, after ABA entered into a contract with Momentum, the ABA Defendants required him to work from the Momentum offices, rather than continuing to work from his home or other locations of his choosing (Pl. Mem., at 12-13), and, although Defendants contest this fact, Plaintiff has submitted his sworn testimony, attesting to his

---

[27] Byrne "was an ABA employee who served as Sale's assistant for a number of years," and who "would schedule [Plaintiff] to attend meetings at ABA Defendants' requests."  (Pl. 56.1 Stmt. ¶¶ 123-24.)

understanding in this regard (Pl. Dep., at 117-18).  Finally, while acknowledging that Defendants were not physically present in New York to monitor his daily activities (Pl. Mem., at 11), Plaintiff also states – and, this, Defendants admit – that, when he performed services for ABA, he communicated and interacted with the ABA Defendants multiple times per day, keeping them apprised of his activities and "the status of certain pitches and negotiations" (Pl. 56.1 Stmt. ¶¶ 94-96; *see also* Pl. Dep., at 36-37).

For their part, Defendants, largely relying on Pinyan's deposition testimony, assert that Plaintiff was not required to report the number of hours he worked, and that he was able to choose where, when, and how much he worked, according to his own convenience.  (*See* Def. Mem., at 8; *see also* Pinyan Dep., at 49, 196).  Defendants also point to evidence in the record suggesting that Plaintiff was not required to attend meetings set by PBM and ABA.  For instance, Defendants cite an email from Plaintiff informing Defendants that he was not available to accompany a client to an event, and to deposition testimony from both Pinyan and Sale stating that Plaintiff could deny invitations for meetings if he could not or did not want to attend.  (Def. Mem., at 9; Pinyan Dep., at 137-38; Second Chong Decl., Ex. G (Deposition of Lori Sale, conducted Oct. 30, 2014 ("Sale Dep.") (Dkt. 70-7)), at 40-41; Ex. K (Emails Regarding Milian/Blackberry Photo Shoot) (Dkt. 70-10).)  Defendants argue that they scheduled meetings on Plaintiff's behalf *not* because they exercised control over his work, but rather because they were providing him with an opportunity to increase his earnings by introducing him to talent and buyers.  (Def. Mem. at 9; Def. Opp. Mem. at 12; Pinyan Dep., at 138-39.)  Similarly, Defendants contend that they made the Momentum workspace available to Plaintiff for his own convenience, but that they never required that he conduct business from that office.  (Def. Mem. at 8; Def. Opp. Mem. at 12-13; Pinyan Dep., at 93-96, 184.)

An employer "need not supervise or monitor an employee on a daily basis to be found to exercise 'control' over that employee as contemplated by the FLSA." *Schwind v. EW & Assoc., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005).  Where a purported employer structures or restricts a worker's routine by requiring attendance at meetings, this can indicate a degree of control.  *See Hart*, 967 F. Supp. 2d at 923-24 (finding that requiring dancers to attend meetings that were not mandated by law was indicative of control).  The fact that a plaintiff communicates with his purported employer several times a day via email and telephone has also been found relevant to the issue of control.  *Schwind*, 357 F. Supp. 2d at 701.  Here, as outlined above, there are factual disputes on the relevant questions of whether Plaintiff was required to attend meetings or to use the Momentum office, and on the extent to which he set his own agenda, as opposed to following one set for him by the company principals.

It has also been found that a purported employer exercises a degree of control where the plaintiff works exclusively for that entity.  *See id.* (finding that the plaintiff was not in business for himself because he worked exclusively for one employer and could not earn other income).  Exclusivity may weigh in favor of a finding of employee status, even where the worker is not contractually precluded from taking on other work, but is only prevented from doing so by a company's demands on his time.  *See Gustafson*, 171 F. Supp. 2d at 325 ("There is no evidence that [Plaintiff] solicited outside business, or realized a profit other than the hourly compensation plaintiff received from the Company.  Indeed, the Company's demands on plaintiff's time essentially precluded him from seeking outside revenue.").  Where a dispute exists as to whether a plaintiff was free to engage in other work, courts have found material facts in controversy with respect to the degree of control exercised by his purported employer.  *See Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 455 (S.D.N.Y. 2002).

In this case, Plaintiff asserts that he worked exclusively for Defendants from the time he began working for PBM until the end of his employment with ABA, that he was precluded from seeking to negotiate his own deals with talent that was not signed to PBM or ABA, and that he had no clients outside of his relationship with PBM and ABA.  (*See* Pl. Mem., at 12; *see also* Pl. Dep., at 90-91, 106, 110.)  To some extent, these assertions are buttressed by Pinyan's own deposition testimony, in that he acknowledged that Plaintiff would have been required to disclose any deal that he closed with a non-ABA client and to have the money from such a deal be paid to ABA.  (Pinyan Dep., at 124-25.)  Nonetheless, Defendants argue that the business arrangement between the parties was not exclusive, and that Plaintiff was free to engage in deals that did not involve ABA clients.  (Def. Mem., at 16-17; Def. Opp. Mem at 23-24.)  Furthermore, Pinyan testified that Plaintiff did, in fact, attempt to do business deals outside of his relationships with PBM and ABA.  (Pinyan Dep., at 122-24.)  The parties' conflicting testimony as to the exclusivity of their business arrangement, and as to Plaintiff's ability to obtain outside employment, is central to the question of whether Plaintiff was in business for himself or dependent on Defendants for the ability to earn an income.  Given that these material issues are in dispute, as are issues regarding the extent to which Defendants dictated when, where, and how Plaintiff performed his work, this Court cannot determine, on the record presented, how to weigh this first, crucial factor – the degree of Defendants' control over Plaintiff's work.  This alone is sufficient to preclude summary judgment, in either Plaintiff's or Defendants' favor, on the issue of whether Plaintiff was Defendants' employee.

### 2.   Opportunity for Profit or Loss

A disputed issue of fact also limits the Court's ability to give full consideration to the second factor relevant to its inquiry.  This factor relates to whether Plaintiff had a varying opportunity for profit (and risk of loss) in his work for Defendants, and, relatedly, whether he

made personal investments in that work, such as by incurring his own business expenses; both of these would suggest that he was more likely working as an independent contractor.  On these points, Plaintiff states that he did not invest in his work for PBM or ABA by putting any of his own money at risk; rather, he contends that the businesses invested in him, by providing him with necessary supplies and paying for, *inter alia*, the costs associated with the Momentum office.  (Pl. Mem., at 13-14; *see also* Pl. Dep., at 27-28; Pinyan Dep., at 38-40.)  Plaintiff argues, in fact, that Defendants reimbursed him for all business-related expenses.[28]  (Pl. Mem., at 3, 5, 13; Pl. Opp. Mem., at 5-6; *see also* Pl. Dep., at 88; Pinyan Dep., at 52-54.)  By contrast, Defendants argue that Plaintiff had an opportunity for profit in his work because – as Plaintiff admits – he worked in a commission-based, "eat what you kill" business, where his earnings were largely dependent on the amount of business he brought in for Defendants (Def. Mem., at 11; *see also* Pl. Dep., at 29); Defendants further suggest that Plaintiff, at least in some way, "invested" in Defendants' businesses, in that he shared industry contacts that he had developed independently of PBM and ABA.  (Def. Mem., at 11-12; Def. Opp. Mem., at 14-15.)

While commission-based workers do, by definition, have an opportunity for profit (thus suggesting that they may best be categorized as independent contractors), this factor is not dispositive.  *See Dixon v. Zabka*, No. 3:11-CV-982 (MPS), 2014 WL 6084351, at *24 (D. Conn. Nov. 13, 2014); *see also Evans v. MassMutual Fin. Grp.*, 856 F. Supp. 2d 606, 610 (W.D.N.Y. 2012) ("The fact that plaintiff received commissions rather than a salary . . . tends to indicate that

---

[28] Plaintiff does not explain how his claim that Defendants' reimbursed him for all business-related expenses can be reconciled with the fact that he claimed deductions for business expenses on his tax returns for the years 2010-2012.  (*See* Reilly Decl., Ex. DD, at 103, 105, 107.)  Defendants argue that this discrepancy shows that Plaintiff "double dipped" by both obtaining reimbursement for such expenses from Defendants and claiming such deductions as business expenses relating to his self-employment.  (Def. Reply, at 5-7.)  The propriety of Plaintiff's claimed tax deductions is not, however, a question before this Court.

he may have been an independent contractor . . . although it is not dispositive.").  To the contrary, where a worker is commission based, but puts none of his own money at risk, this factor may actually weigh in favor of a finding of "employee" status.  *See Schwind*, 357 F. Supp. 2d at 701 (finding that this factor weighed in favor of employee status where employee "had an opportunity for profit because he worked on commission," but did not invest his own money in the business).  Moreover, in determining whether an individual's degree of opportunity for profit or loss is indicative of employee or independent-contractor status, courts should take into account whether the business relationship had an exclusive nature that limited the purported employee's opportunity for profit from other sources of work.  *See Campos v. Zopoundis*, No. 3:09-CV-1138 (VLB), 2011 WL 2971298, at \*7 (D. Conn. July 20, 2011); *Schwind*, 357 F. Supp. 2d at 701; *Gustafson*, 171 F. Supp. 2d at 324.

   In this case, it is clear that Plaintiff's work for Defendants gave him a substantial, individual profit opportunity, as it is undisputed that Plaintiff's compensation was entirely based on commissions from deals for which he was responsible.  Nonetheless, it is also evident that Plaintiff's risk of loss from his work for Defendants was essentially zero, in that he made no financial investment in that work; rather, he was reimbursed by Defendants for all of his business expenses.  Although this latter point might suggest that Plaintiff should be found to have been Defendants' employee despite his commission-based pay structure, there remains a factual dispute regarding the exclusivity of the parties' business arrangement.  As discussed above, while Plaintiff contends that his relationship with Defendants was exclusive, Defendants assert that it was not.  Given that this issue would be material to a full evaluation of the "profit-or-loss" factor, *see Campos*, 2011 WL 2971298, at \*7; *Schwind*, 357 F. Supp. 2d at 701; *Gustafson*, 171 F. Supp. 2d at 324, this Court cannot determine how this second factor weighs, prior to the

resolution of the parties' dispute as to whether Plaintiff was free to gain additional profit by conducting work other than that which he performed for Defendants.

### 3.     Degree of Independent Initiative or Skill

The facts regarding whether Plaintiff's job required a significant degree of skill or independent initiative (the third relevant factor) are largely undisputed, but they do not weigh strongly in favor of either party.  There is no evidence in the record suggesting that Plaintiff's work for Defendants required a high degree of skill.  In fact, as noted above, Pinyan testified at his deposition that the offer to Plaintiff of a $40,000 guaranteed salary "was what a first-year agent would have made in an agency" and "was more than fair . . . based on his skill set and skill level."  (Pinyan Dep., at 165.)  On the other hand, the parties agree that, because Plaintiff's compensation was entirely commission-based, the amount that he earned was dependent on his own efforts.  (*See* Pl. Dep., at 29; Pinyan Dep., at 64-65.)  Thus, if Plaintiff did not exercise independent initiative to discover opportunities for talent and to close deals, he would not be entitled to any compensation.

Where a particular job does not require a high degree of skill, but does require the exercise of independent initiative, this factor cannot be said to weigh heavily in favor of either employee or independent contractor status.  *See Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 542 (S.D.N.Y. 2014).

### 4.     Permanence or Duration of the Working Relationship

The material facts with respect to the fourth relevant factor – the permanence or duration of the working relationship between the parties – are essentially undisputed.  The period of Plaintiff's work for PBM (from about July, 2010, through the time that Pinyan shut down the company in December, 2010) seems plain, as does the period of Plaintiff's work for ABA (from about January 1, 2011 to about November 20, 2012, at which time Plaintiff voluntarily left the

position).  (*See* Pl. Dep., at 32, 36, 41-42; Pinyan Dep., at 121.)  Further, although Defendants

argue that, when negotiating for a change in his compensation structure, Plaintiff himself

requested that the terms of the arrangement be reevaluated in six months (Def. Mem., at 12), it is

apparent from the record that Plaintiff's request for a reexamination in six months referred to the

compensation arrangement, rather than to the business relationship itself (*see* Second Chong

Decl., Ex. F, at D0203, D0206-08).  Nowhere does the record reflect that the parties ever entered

into a contract for Plaintiff to provide specific services for only a limited duration; reevaluated

the relationship on a periodic basis; or, in establishing the relationship, set a definite end date for

Plaintiff's job.  It is thus evident that the parties had a long-term, stable work relationship, of

indefinite duration.  These facts favor a finding that Plaintiff was working as an employee.

*Ethelberth*, 91 F. Supp. 3d at 351-52; *Landaeta*, 2014 WL 836991, at *5.

  The Court notes that Defendants do deny that Plaintiff worked for them on a full-time

basis (*see* Pl. 56.1 Stmt. ¶¶ 23, 25, 89, 90; Def. Counterstatement ¶¶ 23, 25, 89, 90), and, as

noted above, challenge Plaintiff's assertion that they required him to work for them exclusively

(Def. Counterstatement ¶ 118).  While this does not directly impact the issue of the "duration" of

the parties' association or its "permanence," it is arguably a related consideration, as an

exclusive, full-time work relationship is less likely to be transient or limited in scope.  *See*

*Ethelberth*, 91 F. Supp. 3d at 351-52 (finding that this factor weighed in favor of employee status

where plaintiff worked for defendant "on essentially a full-time basis" for a three-year period);

*Campos*, 2011 WL 2971298, at *8 ("[W]here there is no agreement dictating a particular term of

work and the worker puts in significant hours over a substantial period of time, courts have

found this factor to weigh in favor of employment status."); *Schwind*, 357 F. Supp. 2d at 702

(determining that permanence or duration of the relationship weighed in favor of employee status

where the plaintiff "worked exclusively for defendants for approximately four years"); *see also Baker v. Flint Eng'g & Const. Co.,* 137 F.3d 1436, 1442 (10th Cir. 1998) ("Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work *for only one employer* and such relationship is continuous and of indefinite duration." (emphasis added; internal quotation marks and citation omitted)).  Defendants, though, have come forward with no evidence to refute Plaintiff's testimony that he worked for no one other than Defendants during the period of his association with them, and that his hours engaged in work for Defendants averaged more than 40 hours per week.  (Pl. Dep., at 28-29, 55; *see* Def. Counterstatement ¶¶ 23, 25, 89, 90; *see also Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 430 (S.D.N.Y. 2014) (stating that a party opposing motion for summary judgment cannot rest on denials of movant's factual assertions, but must present specific evidence in support of contrary position (citing *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 59-60 (2d Cir. 2004))).

Thus, even if a jury could conclude that Plaintiff was not required to work exclusively for Defendants, and even if Defendants are given the benefit of all favorable inferences regarding Plaintiff's work schedule, the evidence in the record is not capable of creating an issue of fact as to whether Plaintiff worked for Defendants on less than a full-time basis.[29]  As the evidence shows that Plaintiff worked for Defendants continuously, on an essentially full-time basis, over a period of indefinite duration, this factor weighs in Plaintiff's favor.

---

[29] As noted *supra*, there is a small discrepancy ($308) between the amount that Plaintiff was paid by ABA in 2011 and the total amount of income that he claimed on his tax returns for that year.  (*See* Reilly Decl., Ex. CC, at D015; Ex. DD, at 105.)  Plaintiff's tax returns appear to be otherwise consistent with his claim that he did not earn income from any other sources during his working relationship with Defendants.

**5.      Extent to Which the Work Was Integral to Defendants' Business**

When evaluating the fifth relevant factor – the extent to which Plaintiff's work was integral to Defendants' business – "[t]he question is not whether [P]laintiff's individual services were essential to the business, but whether the type of work performed by [P]laintiff was integral to [the business]." *Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672 (CPS) (MDG), 2009 WL 605790, at *8 (E.D.N.Y. Mar. 9, 2009), *aff'd*, 594 F. App'x 714 (2d Cir. 2014).  Where a plaintiff is engaged in a company's primary business, this factor supports a finding of employee status.  *See Brock*, 840 F.2d at 1059 ("[T]he services rendered by the nurses constituted the most integral part of Superior Care's business, which is to provide health care personnel on request."); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 191-92 (S.D.N.Y. 2003) ("[D]efendants concede that they are engaged primarily in the business of providing delivery services to retail establishments and that plaintiffs perform the actual delivery work.  Thus, [P]laintiffs' services constitute an integral part of [Defendants'] business.").

Both PBM and ABA were in the business of representing celebrity talent for the purposes of commercial endorsements and branding.  (*See* Pinyan Dep., at 12; Reilly Decl., Ex. J (Deposition of Jean Kwolek, conducted Oct. 31, 2014 (Dkt. 51-12), at 11); Ex. L (ABA website), at D 217.)  The parties agree that, in Plaintiff's positions with both PBM and ABA, he was tasked with finding endorsement and branding opportunities for the companies' clients.  (Pl. Dep., at 25-26, 29, 33-34; *see also* Def. 56.1 Stmt. ¶¶ 114-21.)  Given the nature of Plaintiff's work, it cannot be said that the work merely provided support to PBM and ABA employees who were engaged in the companies' core functions; instead, by striving to place clients with buyers, Plaintiff contributed to Defendants' primary business.  Accordingly, the record reflects that Plaintiff's work was an integral part of Defendants' business, such that this factor weighs in favor of a finding that Plaintiff was an employee.

6.     **Tax Treatment of Plaintiff's Income and Expenses**

There may also be other factors relevant to the economic reality of the parties' working relationship, including the manner in which that relationship is treated for tax purposes.  *See Brock*, 840 F.2d at 1059.  Courts are somewhat divided, however, as to the importance of this factor.  At least one New York state court has deemed the tax treatment of a plaintiff's income to be a "significant consideration" in determining coverage of the NYLL, *Gagen v. Kipany Prods., Ltd.*, 812 N.Y.S.2d 689, 691 (3d Dep't 2006), which is generally interpreted consistently with the FLSA.  *See Hart*, 967 F. Supp. 2d at 924.  On the other hand, this Court has noted that the test for whether a person is an employee or independent contractor under the FLSA does not depend on "how the parties defined the employment relationship or how the worker identified herself on tax forms," and has therefore held that such considerations are "not significant."  *Id*. (citing *Sandrino v. Michaelson Assocs., LLC.,* No. 10 Civ. 7897 (BSJ), 2012 WL 5851135, at *9 (S.D.N.Y. Nov. 19, 2012) ("The test for whether a person is deemed to be an independent contractor for purposes of New York Labor Law does not depend, however, on what the person has labeled themselves.")).

Certainly, it is well-settled that an employer may not remove a worker who is actually an employee from the protection of the FLSA simply by labeling him or her an independent contractor for tax purposes, *see Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947), and thus the fact that Defendants prepared 1099 Forms indicating that Plaintiff received non-employee compensation is not particularly significant, *see Kalloo v. Unlimited Mech. Co.*, 977 F. Supp. 2d 187, 202 (E.D.N.Y. 2013).  Further, a plaintiff's labeling of himself as an independent contractor is generally not dispositive, and an employee's own tax declaration to this effect will not preclude him from arguing that he is entitled to the protections of the employee wage laws.  *See Saleem*, 52 F. Supp. 3d at 540 ("Speaking of tax returns, there is no

merit to Defendants' argument that Plaintiffs are judicially estopped from . . . arguing that that they are entitled to benefits as employees because they classified themselves as independent contractors on their tax filings.  Put simply, the argument is wrong and has been consistently rejected by numerous courts, including this one." (internal quotation marks and citation omitted)).

Nonetheless, the fact that Plaintiff declared himself to be an independent contractor on his Schedule C Forms should carry some weight, in Defendants' favor.  The record shows that, under penalty of perjury, Plaintiff not only informed the IRS that he was a self-employed, independent contractor, but also claimed substantial tax benefits, in the form of business-expense deductions, on that basis.  (*See* Reilly Decl., Ex. DD, at 105-108; Pl. Counterstatement ¶¶ 21, 24-25, 27-28 (Plaintiff denying that he filed a Schedule C Form for a business named "Integrated Marketing," but acknowledging that he filed such forms on his own behalf and claimed business-related deductions).)  While Plaintiff's tax declaration is not dispositive, and cannot estop him from claiming that he was an employee for FLSA purposes, it does tend to show that Plaintiff understood himself to be an independent contractor and sought to obtain the financial advantages of that characterization when filing his tax returns.  Even if not dispositive, Plaintiff's characterization of himself as an independent contractor on his Schedule C Forms should be found to weigh, at least to some degree, in favor of independent-contractor status.

### 7.    Totality of the Circumstances

The fact-intensive nature of the economic realities test often precludes courts from granting summary judgment where there are factual disputes regarding the nature of the parties' relationship.  *See Landaeta*, 2014 WL 836991, at *4 (S.D.N.Y. Mar. 4, 2014) (noting that courts grant summary judgment on question of whether plaintiff is employee for FLSA purposes "only where there are no disputed issues of material fact").  Here, given that the parties dispute several

issues of material fact, particularly with respect to the "crucial" factor of Defendants' degree of control over Plaintiff's work, *see Gustafson*, 171 F. Supp. 2d at 325 (citing *Carter*, 735 F.2d at 12), this Court is unable to determine as a matter of law whether Plaintiff was an employee or an independent contractor.

In sum, unresolved issues of fact prevent the Court from being able to evaluate the first and second relevant factors (degree of control, and opportunity for profit or loss). The third factor (degree of independent initiative or skill) is relatively neutral. The fourth and fifth factors (permanence or duration of the working relationship, and extent to which the work was integral to Defendants' business) favor a finding that Plaintiff was working as an employee. On the other hand, an additional factor (the tax treatment of Plaintiff's income) favors a finding that Plaintiff was an independent contractor, although this factor cannot be considered dispositive. On this record, this Court cannot conclude that either Plaintiff or Defendants are entitled to summary judgment on the issue of whether Plaintiff was an employee or independent contractor, and this is true regardless of which side, in opposing the other's motion, receives the benefit of favorable inferences.

The undisputed facts do establish that Plaintiff enjoyed a significant degree of independence in determining how to carry out his responsibilities, but there is contrary evidence in the record suggesting that, as a matter of economic reality, Plaintiff was not in business for himself in any meaningful way. Indeed, depending on the fact finder's resolution of the disputed factual issues, the Court could reasonably conclude either that Plaintiff worked free from actual supervision or control of his day-to-day activities, such that he was in business for himself, or, alternatively, that Plaintiff was closely supervised and directed, and that he would have been

incapable of earning money without the ability to access Defendants' client base and to represent himself as part of the PBM or ABA team.

I therefore recommend that the Court deny both of the parties motions for partial summary judgment on Plaintiff's FLSA claims, on the threshold inquiry of whether Plaintiff was an employee or an independent contractor for purposes of the FLSA.

      **B.**    **Whether Plaintiff was an Employee
              Within the Meaning of the NYLL__**

As stated above, while the relevant test is stated differently under the NYLL, courts generally afford the FLSA and NYLL consistent interpretations with respect to the question of whether a worker was an employee or an independent contractor.  *Hart*, 967 F. Supp. 2d at 924. Here, for substantially the same reasons stated above, this Court also recommends that the Court deny both of the pending motions for summary judgment on the issue of whether Plaintiff was an employee or an independent contractor for purposes of the NYLL.

Specifically, there are no issues of material fact with respect to two factors of the NYLL's test for employee status – whether the worker (1) received fringe benefits, and (2) was on the purported employer's payroll – but these two factors, in this case, weigh in opposite directions.  The parties do not dispute that the ABA Defendants paid the cost of Plaintiff's health insurance, and that Defendants reimbursed Plaintiff for other business-related expenses, including meals, drinks, and transportation costs (*see* Pl. 56.1 Stmt. ¶¶ 28-29, 80-83, 131; Def. 56.1 Stmt. ¶ 16, 55, 71; *see also* Pl. Dep., at 88-89, 106; Sale Dep., at 46-47; Pinyan Dep., at 50-53, 63), thus suggesting that Plaintiff had "employee" status.  It is also undisputed, though, that Plaintiff was not on Defendants' payroll and was issued 1099 Forms listing his pay as non-employee compensation (*see* Def. Mem. at 18-19; Def. Reply, at 5-7; Pl. Mem., at 19; Reilly

Decl., Ex. CC (1099 Forms for years 2011-13); Ex. H (1099 Forms for year 2010)), suggesting that he was an independent contractor.

As to the remaining three factors – whether the worker worked at his own convenience; was free to engage in other employment; and was on a fixed schedule – genuine issues of material fact preclude the Court from being able to determine Plaintiff's status as a matter of law. As discussed above, the parties point to conflicting evidence in the record as to the questions of whether Plaintiff was required to attend meetings scheduled by Defendants and whether he was free to engage in other employment.  Further, while Plaintiff states that Defendants required him to work about 50 hours per week (Pl. Mem., at 11, 20; Pl. 56.1 Stmt. ¶ 23-25, 89-90), Defendants deny that this was required, and maintain that, to the extent Plaintiff worked both early and late hours, this was dictated by the nature of Plaintiff's business, as he corresponded with buyers on both the East and West Coasts, and by Plaintiff's own motivation to bring in commissions. Defendants further contend that Plaintiff was never required to report his hours and was free to set his own schedule.  (Def. 56.1 Stmt. ¶ 90; Pinyan Dep., at 48.)  Each of these disputes is directly relevant to the "critical inquiry" under the NYLL test, which is "the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."  *Bynog*, 1 N.Y. 3d at 198.

I therefore recommend that the Court deny both of the parties' motions for partial summary judgment on the issue of whether Plaintiff was an employee or an independent contractor under the NYLL.[30]

---

[30] As issues of fact preclude summary judgment on the issue of whether Plaintiff was an "employee" under the FLSA and NYLL, similar issues necessarily preclude judgment on the additional issue of whether each of the Defendants, including the individuals who served as the principals of PBM and ABA, should be considered an "employer" under those statutes.  *See Ouedraogo v. A-1 Intern. Courier Serv., Inc.*, No. 12-CV-5651 (AJN), 2014 WL 4652549, at *6

**C.**    **Whether Plaintiff Was Exempt from Coverage Under**
**the FLSA and NYLL Under the Outside Salesman Exemption**

Defendants argue that, if Plaintiff was an employee, then it would have been proper to characterize him as an "outside salesman," such that, in any event, he would have been exempt from the overtime and minimum wage requirements of the FLSA and NYLL.  (Def. Mem., at 32.)  In this regard, Defendants contend that Plaintiff's "primary duty" was obtaining orders for contracts for services.  (*Id.*)  Further, recognizing that the "outside salesman" exemption requires the worker to have been "customarily and regularly engaged away from the employer's place or places of business" in performing his primary duty, 29 C.F.R. § 541.500, Defendants assert that Plaintiff never worked at the California offices of PBM and ABA, instead working from his home, the Momentum office in New York, and various other locations where wireless Internet was available (Def. Mem., at 33).  Moreover, Defendants assert that Plaintiff "frequently" attended meetings and events, and that he was "out of the office" two to five times per week, meeting with clients and buyers.  (*Id.* at 34 (citing Pl. Dep., at 76-77, 91-93).)

When construing the evidence in the light most favorable to Plaintiff, these facts fall far short of establishing that Plaintiff worked as an "outside salesman" as a matter of law.  As an initial matter, the undisputed facts do not establish that Plaintiff's primary duty was to obtain orders or contracts for services, as Defendants argue.  (*See* Def. Mem., at 32; *see also* 29 C.F.R. § 541.500(a)(1)(ii).)  In *Gorey v. Manheim Services Corp.*, the court found that employees of an

---

(S.D.N.Y. Sept. 18, 2014) ("[A]n entity's status as an 'employer' is inextricably tied with its workers' status as 'employees.'").  Similarly, these factual disputes preclude a determination as to whether Plaintiff's claim to the final installment of the commission on the Brody-Gillette deal is governed by NYLL, Article 6, §§ 191(c) and 198, as the applicability of these provisions also turns on the question of whether Plaintiff was an "employee."  *See Kirsch*, 148 F.3d at 170; *DeLuca*, 695 F. Supp. 2d at 62.  Thus, this Court does not separately address these additional issues.

automobile auction operator, who were tasked with inducing dealers to bring cars to auction lots, and who then earned commissions when buyers purchased those cars, were not engaged in outside sales.  788 F. Supp. 2d 200, 206-07 (S.D.N.Y. 2011).  The court reasoned that the plaintiffs did not obtain binding commitments to bring the cars to auction, and that they relied on others to consummate the sales from which they earned commissions.  *Id.*  Similarly, while it is clear in this case that Plaintiff was engaged in offering the services of PBM and ABA clients to brands with endorsement opportunities, there is no evidence in the record showing that Plaintiff actually obtained binding commitments for the provision of those services, instead of relying on clients and buyers to consummate contracts.  Thus, there remain genuine issues of fact regarding whether Plaintiff was primarily tasked with obtaining orders or contracts for services.

Further, even if the Court were to accept that Plaintiff's primary duty was to obtain binding orders or contracts for services, the record does not establish that he carried out this duty by engaging in outside sales away from his employer's place of business.  Defendants' arguments on this point ignore the fact that "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property."  29 C.F.R. § 541.502; *see Tracy v. NVR, Inc.*, 599 F. Supp. 2d 359, 361 (W.D.N.Y. 2009).  Thus, both Plaintiff's home office and the Momentum office should be considered Defendants' places of business for purposes of the outside salesman analysis, and any solicitation of buyers that Plaintiff performed from either of those two locations would not fall within the exemption.  *See* 29 C.F.R. § 541.502 ("An outside sales employee must be customarily and regularly engaged 'away from the employer's place or places of business.'  The

outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home.").

Finally, the definition of "[o]utside sales does not include sales made by mail, telephone, or the Internet unless such contact is used merely as an adjunct to personal calls."  29 C.F.R. § 541.502; *see Marcus v. AXA Advisors, LLC*, 307 F.R.D. 83, 93 n.12 (E.D.N.Y. 2015).  Thus, any work that Plaintiff performed via telephone or email, from his home office, the Momentum office, or any other location, did not constitute outside sales.  The record shows that a substantial part of Plaintiff's job included communicating with clients and buyers by telephone and email from either Plaintiff's home office or the Momentum office.  (Pl. 56.1 Stmt. ¶¶ 26-27, 46-48; Def. 56.1 Stmt. ¶¶ 14, 101-02.)  In fact, Defendants point to no evidence in the record showing that Plaintiff generally closed deals during the course of meeting with clients and buyers outside of the office, such that the work he conducted via email and phone should be considered incidental to those face-to-face meetings.

I therefore recommend that Defendants' motion for summary judgment on the issue of whether Plaintiff was exempt from the FLSA as an outside salesman be denied.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that both of the parties' motions for partial summary judgment (Dkts. 47 and 50) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three additional days for service by mail).  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States Courthouse,

500 Pearl Street, Room 2240, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      November 24, 2015

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All Counsel (via ECF)